KYLE SCHUMACHER (BAR #121887)
kyle@schumacherlane.com
**SCHUMACHER LANE PLLC**
P.O. Box 558
Spring Branch, TX 78070
503-482-8137 ph
210-783-1383 fax

Attorneys for Plaintiff
Juanita Burgess

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON – PORTLAND DIVISION

| | |
|---|---|
| Juanita Burgess, <br><br> Plaintiff, <br><br> v. <br><br> Equifax Information Services, LLC; TransUnion, LLC; Great Lakes Educational Loan Services, Inc.; and DOES 1 through 100 inclusive, <br><br> Defendants. | CASE NO. 3:20-cv-02029 <br><br> PLAINTIFF'S COMPLAINT FOR DAMAGES: <br><br> 1. Violation of Fair Credit Reporting Act |

COMES NOW Plaintiff **JUANITA BURGESS** ("Plaintiff"), an individual, based on information and belief, to allege as follows:

**INTRODUCTION**

1. This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681s-2(b), 1681e(b), 1681i(a)(2)(A), 1681i(a)(4), and 1681i(a)(5)(A). Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's debt.

2. Here, Great Lakes Educational Loan Services, Inc. ("Great Lakes"), as loan servicer for debts owed to the United States Department of Education, is not reporting Plaintiff's accounts accurately.

3. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking

system and unfair credit reporting methods undermine the public confidence that is essential to the continued functioning of the banking system.

4. Creditors intentionally and routinely ignore industry standards for accurately reporting debt information. Creditors know that deviating from recognized credit reporting standards will make it difficult for consumers to raise their credit scores and improve their creditworthiness.

5. This was not the intent of Congress when it enacted the Fair Credit Reporting Act.

## JURISDICTION & VENUE

6. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

7. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. § 1681.

8. This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

9. Plaintiff alleges that, for purposes of establishing residency under 28 U.S.C. § 1391(b)(1), each named Defendant conducts sufficient business within the forum state and this Court has personal jurisdiction over Defendants under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## GENERAL ALLEGATIONS

10. Plaintiff alleges that each and every Defendant is familiar with credit reporting industry standards and subscribes thereto.

11. Plaintiff alleges that each and every Defendant understands that deviation from credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized industry standard.

12. Plaintiff alleges that all of Defendants' actions alleged herein were committed knowingly, intentionally, and in reckless disregard for credit reporting industry standards to purposefully undermine Plaintiff's ability to repair his FICO Score.

13. In the alternative, Plaintiff alleges that each and every Defendants' actions were the result of reckless policies and procedures that inevitably led to inaccurate, misleading, or incomplete credit reporting.

//
//

## FACTUAL BACKGROUND

14. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.     FICO, Inc.**

15. FICO is a leading analytics software company with its principal headquarters in San Jose, California. FICO has over 130 patents related to their analytics and decision management technology and regularly uses mathematical algorithms to predict consumer behavior, including credit risk.

16. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent (90%) of lending decisions.

17. A FICO Score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

18. Base FICO Scores range from 300 to 850, while industry specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

19. Different lenders use different versions of FICO Scores when evaluating a consumer's creditworthiness.

20. There are twenty-eight (28) FICO Scores that are commonly used by lenders.

21. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

22. The three largest CRAs are Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); and TransUnion, LLC ("TransUnion").

23. FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models, or algorithms, are based on the premise that the information provided by the CRAs is accurate and complies with credit reporting industry standards.

24. There are five (5) key factors that a FICO Score considers: (1) payment history; (2) amount of debt; (3) length of credit history; (4) new credit; and (5) credit mix.

25. Each of the five (5) factors is weighted differently by FICO.

26. In other words, thirty-five percent (35%) of a consumer's FICO Score relates to payment history, thirty percent (30%) relates to the amount of debt, fifteen percent (15%) relates

to the length of credit history, ten percent (10%) relates to new credit, and the final ten percent (10%) relates to a consumer's credit mix, which is the different types of debts reported.

27. Payment history refers to whether a consumer has paid their bills in the past, on time, late, or missed payments. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. Public record items, such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

28. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

29. Once a delinquent account has been remedied, the longer the account stays current the more a consumer's FICO Score should increase.

30. FICO Scores are entirely dependent upon information provided by data furnishers ("DFs"), such as banks and other financial institutions, to CRAs.

31. The FICO scoring formula treats both Chapter 7 and Chapter 13 Bankruptcies similarly in terms of their impact on one's FICO Score. Specifically, both Chapters have the same level of severity with respect to their FICO Score and FICO uses the *filing date*, under both Chapters, to determine how long ago the bankruptcy took place.

**B.     Metro 2**

32. The Consumer Data Industry Association ("CDIA") is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening, and collection services industries.

33. The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by CDIA to universally report debts in a particular manner that is understood to be the most accurate in reporting a debt. In other word, the Metro 2 format was designed to allow reporting of the most accurate and complete information on consumers' credit history.

34. The CDIA's Metro 2 format is the credit reporting industry standard for accurate credit reporting.

35. The credit reporting industry at large depends upon the Metro 2 format and the CDIA's recommendations for reporting debt accurately.

//

36. The CDIA is *the* expert on accurate credit reporting. In support of this allegation, Plaintiff avers the following:

    a.    The CDIA offers a FCRA certificate program for all CRAs.

    b.    The CDIA offers a FCRA awareness program for all CRAs.

    c.    The CDIA offers a FCRA certificate program for DFs.

    d.    The CDIA offers a FCRA awareness program for DFs.

    e.    The CDIA offers a Metro 2 learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 format as well as the relationship between multiple fields.

    f.    The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and TransUnion.

    g.    The CDIA developed a credit reporting resource guide for accurately reporting credit.

37. The CDIA's Metro 2 format is accepted by all CRAs.

38. The credit reporting accepted industry standards for reporting Metro 2 accurately are found in the CDIA's credit reporting resource guide ("CRRG").

39. The CRRG outlines the industry standards for most accurately reporting debts using Metro 2 format.

40. The CRRG is not readily available to the public. It can be purchased for $229.45.

41. Even if a buyer is ready, willing, and able to pay for the CRRG, the CDIA will <u>not</u> grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.

42. When FICO calculates credit scores, the algorithms use Metro 2 information based on industry standards established by the CDIA.

43. The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.

44. If the Metro 2 data received by FICO deviates from industry standards, an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower, a consumer will be considered a higher credit risk resulting in less favorable lending terms.

//

C.  **e-OSCAR**

45. e-OSCAR is the web-based, Metro 2 compliant system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

46. When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

47. The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g., "Account Type" "07" (07 in Metro 2 refers to a Charge Account).

D.  **Plaintiff's Credit Report Contains Inaccurate Adverse Tradelines, which Plaintiff Disputed to no Avail**

48. On August 27, 2020, Plaintiff ordered a three-bureau credit report from Experian to ensure proper reporting by Plaintiff's creditors (the "August 27 Credit Reports").

49. Plaintiff noticed adverse tradelines in her August 27 Credit Reports, reporting inaccurate, misleading, or incomplete information that did not comply with credit reporting industry standards.

50. Plaintiff then disputed the inaccurate tradelines regarding the accounts with Great Lakes via certified mail to Equifax and TransUnion on or about September 22, 2020 (the "Dispute Letter").

51. In regard to the Equifax credit report, Plaintiff's Dispute Letter specifically put Great Lakes on notice that Plaintiff's credit report was inaccurately reporting the payment status of two of her accounts.

52. In regard to the TransUnion credit report, Plaintiff's Dispute Letter specifically put Great Lakes on notice that Plaintiff's credit report was inaccurately reporting the payment status of two of her accounts.

53. Plaintiff requested that any derogatory reporting be updated to ensure accuracy and completeness of the accounts as required by the FCRA.

54. Plaintiff is informed and believes that Equifax and TransUnion received Plaintiff's Dispute Letters and, in response, sent Plaintiff's dispute to Great Lakes, as the data furnisher, via an ACDV through e-OSCAR.

55. On October 30, 2020, Plaintiff ordered a second credit report from Equifax and TransUnion to determine if her accounts were updated.

### a. Inaccuracy – Great Lakes

56. Despite actual knowledge, Defendant Great Lakes continued to report one of Plaintiff's accounts, beginning in 678576xxxx, to Equifax with a current payment status of "At least 120 days or more than four payments past due", even though the account is closed and has a zero balance.

57. In addition, and despite actual knowledge, Defendant Great Lakes continued to report another of Plaintiff's accounts, beginning in 678579xxxx, to Equifax with a current payment status of "At least 120 days or more than four payments past due", even though the account is closed and has a zero balance.

58. Despite actual knowledge, Defendant Great Lakes continued to report one of Plaintiff's accounts, beginning in 678576xxxx, to TransUnion with a current payment status of "120 days past due", even though the account is closed and has a zero balance.

59. In addition, and despite actual knowledge, Defendant Great Lakes continued to report another of Plaintiff's accounts, beginning in 678579xxxx, to TransUnion with a current payment status of "120 days past due", even though the account is closed and has a zero balance.

60. Equifax and TransUnion provided notice to Great Lakes that Plaintiff was disputing the inaccurate and misleading information, but Great Lakes failed to conduct a reasonable investigation of the information as required by the Fair Credit Reporting Act.

61. Plaintiff alleges that Great Lakes did not review well-established industry standards for credit reporting.

62. If Great Lakes reviewed such standards, it would have seen that its reporting was not in compliance and was therefore inaccurate or incomplete.

63. By continuing to report Plaintiff's accounts to Equifax as described in paragraphs 56 and 57, and to TransUnion as described in paragraphs 58 and 59, it incorrectly appears to third parties viewing Plaintiff's credit report that Plaintiff is currently behind on her payments, which in inaccurate.

64. The lack of investigation by Great Lakes is unreasonable.

**E.    Damages**

65. Plaintiff pulled the credit reports at issue at a cost for access to the report, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

//

66. As a result of the incorrect reporting, Plaintiff has also suffered emotional harm and excessive stress resulting in doubt as to the effectiveness of the Fair Credit Reporting Act and the power of this Court to preserve and perpetuate Plaintiff's rights to accurate credit reporting as intended by Congress.

67. As payment history (including payment status) makes up thirty-five percent (35%) of a consumer's FICO Score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to pouring through each tradeline of every account listed to obtain context), the incorrect payment statuses reported by Defendants is effectively lowering Plaintiff's credit score, which adversely affects Plaintiff's ability to obtain credit.

68. Plaintiff has been denied credit and is unable to rebuild her credit based on the inaccurate reporting by the Defendants.

69. The Defendants' actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

## FIRST CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))

### (Against Defendants and Does 1-100)

70. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.  Equifax and TransUnion Failed to Assure Credit Reporting Accuracy**

71. Equifax and TransUnion (collectively, the "CRA Defendants") violated 15 U.S.C. § 1681e(b) by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and the credit files it published and maintained concerning Plaintiff.

72. Had the CRA Defendants maintained reasonable procedures to assure maximum accuracy, the CRA Defendants would never have allowed Great Lakes to report the accounts as described herein.

73. Equifax knew, or should have known, that the Great Lakes accounts should not have been reported with a current payment status tradeline of "At least 120 days or more than four payments past due" since the accounts were closed with zero balances. Further, Equifax knew, or should have known, that this inaccurate and incomplete tradeline does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

74. TransUnion knew, or should have known, that the Great Lakes accounts should not have been reported with a current payment status tradeline of "120 days past due" since the accounts were closed with zero balances. Further, TransUnion knew, or should have known, that this inaccurate and incomplete tradeline does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

75. As a result of the CRA Defendants' violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit and other mental and emotional distress.

**B.    Willful Violations**

76. The CRA Defendants' violations, as described herein, were willful; specifically, the Credit Bureaus, including Defendants Equifax and TransUnion, have intentionally and purposefully set up a system where inaccuracies are not only probable, but inevitable.

77. The CRA Defendants regularly, as a policy, ignore disputes by consumers and fail to perform even a basic investigation regarding the dispute. Additionally, the CRA Defendants regularly fail to forward disputes to data furnishers, thereby frustrating the entire dispute process.

78. To the extent the CRA Defendants do send consumer disputes, the CRA Defendants send these disputes to employees who do not live within the continental United States to hide or subvert a consumer's liability to confront the individual(s) directly responsible for approving accurate reporting.

79. The CRA Defendants' employees receive little to no training concerning how to accurately report consumer debt.

80. Instead, the CRA Defendants' employees are instructed to parrot whatever information a data furnisher provides regardless of whether the information is accurate.

81. The CRA Defendants' employees are regularly expected to review and approve over ninety (90) disputes per day, rendering less than five (5) minutes to review, investigate, and respond to each dispute received.

82. The CRA Defendants have intentionally set up this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

83. As a result of the CRA Defendants' violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including, but not limited to: damage to reputation, embarrassment,

humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

84. The CRA Defendants' violations were willful, rendering each of them individually liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.

85. In the alternative, the CRA Defendants were negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

86. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys' fees from the CRA Defendants in an amount to be determined by this Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## SECOND CAUSE OF ACTION
### (Violation of Fair Credit Reporting Act 15 U.S.C. §§ 1681s-2(b) and 1681i(a)(1))
### (Against Defendants and Does 1-100)

87. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.  Great Lakes Failed to Reinvestigate Following Plaintiff's Dispute**

88. Pursuant to 15 U.S.C. §§ 1681s-2(b) and 1681i(a)(1), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

89. Great Lakes violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation and re-reporting misleading and inaccurate account information.

90. Equifax and TransUnion provided notice to Great Lakes that Plaintiff was disputing the inaccurate and misleading information; however, Great Lakes failed to conduct a reasonable investigation as required by the FCRA.

91. The lack of investigation, as required by the FCRA, is unreasonable.

**B.  Willful Violations**

92. Plaintiff further alleges that Great Lakes has not properly trained those directly investigating disputes on Metro 2 generally or credit reporting industry standards and, as such, have developed reckless policies and procedures.

//

93. Plaintiff alleges that rather than train its employees on accurate credit reporting and industry standards, Great Lakes' employees tasked with reviewing disputes are expected to confirm the information being reported as accurate instead of investigating the reporting.

94. In the alternative, Great Lakes was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

**C.   The CRA Defendants Failed to Reinvestigate the Disputed Information in violation of 15 U.S.C. § 1681i(a)(1)**

95. Pursuant to 15 U.S.C. 1681i(a)(1), the CRA Defendants were required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's dispute regarding the Great Lakes accounts.

96. Thus, the CRA Defendants failed to conduct a reasonable investigation and correct the misleading and/or inaccurate statements on the accounts within the statutory time frame.

97. The CRA Defendants are not passive entities bound to report whatever information a data furnisher provides.

98. Plaintiff alleges the CRA Defendants are readily familiar with Metro 2 guidelines and credit reporting industry standards.

99. Based on the foregoing, Plaintiff alleges that the CRA Defendants can, and do, suppress inaccurate information from being reported when data furnishers provide inaccurate information.

100. Both Equifax and TransUnion can and do instruct data furnishers on how to properly report certain accounts from time to time upon request from a data furnisher.

101. The CRA Defendants failed to conduct a reasonable investigation because any basic investigation would have uncovered that Great Lakes was not reporting the accounts at issue correctly.

102. Had the CRA Defendants conducted proper investigations, they could have closed or bookended the Great Lakes debts by adding a notation on their respective credit reports to show the debts were either properly paid in full, transferred, or were no longer past due.

103. Equifax continued to report the two accounts with a current payment status of "At least 120 days or more than four payments past due", and TransUnion continued to report the two accounts with a current payment status of "120 days past due".

104. The CRA Defendants, therefore, did not conduct even the most basic investigation regarding credit reporting industry standards, otherwise the aforementioned would have been uncovered.

## THIRD CAUSE OF ACTION
### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))
### (Against Defendants and Does 1-100)

105. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.  The CRA Defendants Failed to Review and Consider all Relevant Information**

106. The CRA Defendants violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

107. The CRA Defendants' violations of 15 U.S.C. § 1681i(a)(4) have caused Plaintiff to suffer actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.  Willful Violations**

108. The CRA Defendants' violations were willful, rendering each of the CRA Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

109. In the alternative, the CRA Defendants were negligent in failing to review and consider all relevant information Plaintiff submitted, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

110. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys' fees from the CRA Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

//
//
//
//
//
//
//

# FOURTH CAUSE OF ACTION
## (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))
## (Against Defendants and Does 1-100)

111. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    The CRA Defendants Failed to Delete Disputed and Inaccurate Information**

112. The CRA Defendants violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

113. The CRA Defendants' violations of 15 U.S.C. § 1681i(a)(5)(A) have resulted in Plaintiff suffering actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.    Willful Violations**

114. The CRA Defendants' violations were willful, rendering each of the CRA Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

115. In the alternative, the CRA Defendants' were negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

116. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys' fees from the CRA Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

//
//
//
//
//
//
//
//
//
//

## PRAYER FOR RELIEF

117. WHEREFORE, Plaintiff prays for judgment as follows:

   a. For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;

   b. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;

   c. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;

   d. Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;

   e. For determination by the Court that Defendant's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq.*; and

   f. For determination by the Court that Defendant's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

Respectfully submitted,

**SCHUMACHER LANE PLLC**

Dated: November 21, 2020

*/s/ Kyle Schumacher*
Kyle Schumacher
Attorneys for Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial of this matter by jury.

                                                                  **SCHUMACHER LANE PLLC**

Dated: November 21, 2020              */s/ Kyle Schumacher*
                                                             Kyle Schumacher
                                                             Attorneys for Plaintiff